**SATTERLEE STEPHENS BURKE & BURKE LLP**
230 Park Avenue, Suite 1130
New York, New York 10169
Tel. (212) 818-9200
Fax (212) 818-9606
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEWSMAX MEDIA, INC. | |
| Plaintiff, | C.A. No. 13-cv-06248-JAP-LHG |
| v. | Hon. Joel A. Pisano, U.S.D.J. |
| MARK NEJMEH, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1790200_4

## TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 2

      A.    Newsmax and the Newsmax Marks ........................................................ 2

      B.    Newsmax Marks' Renown and Growing Audience ................................ 3

      C.    Defendant's Bad Faith Registration of Newsmax.us ............................. 4

      D.    Defendant's Refusal to Sell or Transfer Newsmax.us ........................... 4

      E.    Defendant's Infringing Use of Newsmax.us ......................................... 6

ARGUMENT ....................................................................................................... 7

I.     THE EQUITIES FAVOR ENTRY OF EMERGENCY INJUNCTIVE RELIEF .............. 7

      A.    Legal Standards ..................................................................................... 7

      B.    Newsmax is Entitled to Emergency Injunctive Relief .......................... 8

II.    NEWSMAX IS HIGHLY LIKELY TO SUCCEED ON THE MERITS OF ITS LANHAM ACT CLAIMS ................................................................................ 9

      A.    Standards for Trademark Infringement and Unfair Competition ........... 9

      B.    Newsmax Owns Valid and Protectable Marks ...................................... 9

      C.    Defendant's Domain and Mark Are Likely to Cause Consumer Confusion .......... 9

            i.   *The Newsmax Marks and Newsmax.us are Effectively Identical (Factor 1)* ........................................................................................ 10

            ii.   *The Newsmax Marks are Distinctive and Strong (Factor 2)* ........... 11

           iii.   *Defendant is Promoting Identical Goods and Services through the Same Channels of Trade and to the Same Consumers (Factors 7, 8 and 9)* ...................................................................................................... 12

           iv.   *The Parties' Consumers are Likely to be Confused (Factor 3)* ....... 13

i

       *v.   Defendant is Willfully Infringing the Newsmax Marks (Factor 5)* ..................*13*

       *vi.  Actual Confusion is Not Relevant (Factors 4 and 6)* .......................................*14*

III.    NEWSMAX IS LIKELY TO SUCCEED ON THE MERITS OF ITS CYBERSQUATTING CLAIM UNDER 15 U.S.C. § 1125(D) .......................................15

    A.       Standards for Anti-Cybersquatting Consumer Protection Act..............................15

    B.       Defendant's Registration and Use of the Domain Evidences Bad Faith ..............16

       *i.    Defendant Has No Legitimate Rights to the Domain (Factors I and II)* .........*16*

       *ii.  Defendant Makes No Bona Fide or Fair Use of the Domain (Factors III and IV)* ...........................................................................................................*17*

       *iii. Defendant Sought to Sell the Domain for a Significant Sum (Factor VI)*........*17*

IV.    NEWSMAX WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED ..........................................................................................18

V.     DEFENDANT WILL NOT SUFFER ANY LEGALLY COGNIZABLE HARM IF INJUNCTIVE RELIEF IS GRANTED .......................................................................19

VI.    THE PUBLIC INTEREST FAVORS AN INJUNCTION ...............................................20

CONCLUSION....................................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000)...............................................................................9, 10, 11

*Advance Magazine Publishers Inc. v. Vogue Int'l*,
    123 F. Supp. 2d 790 (D.N.J. 2000) ............................................................... passim

*Allegheny Energy, Inc. v. DQE, Inc.*,
    171 F.3d 153 (3d Cir.1999)..............................................................................................8

*American Civil Liberties Union v. Reno*,
    1998 WL 813423, Civ. No. A. 98-5591 (Nov. 23, 1999).......................................7

*Bieros v. Nicola*,
    857 F. Supp. 445 (E.D. Pa. 1994) .............................................................................7

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
    269 F.3d 270 (3d Cir. 2001)......................................................................................11

*Davinci Tech. Corp. v. Rubino*,
    2005 WL 1249462, Civ. No. 05-1561 (D.N.J. May 25, 2005).......................9, 11, 15

*Dluhos v. Strasberg*,
    2005 WL 1683696, Civ. No. 00-3163 (D.N.J. June 24, 2005)..............................13

*Fancaster, Inc. v. Comcast Corp.*,
    832 F. Supp.2d 380 (D.N.J. 2011) ..........................................................................11

*Fisons Horticulture v. Vigoro Indus.*,
    30 F.3d 466 (3d Cir. 1994)..........................................................................................9

*Green v. Fornario*,
    486 F.3d 100 (3d Cir. 2007)......................................................................................17

*Highmark Inc. v. UPMC Health Plan*,
    276 F.3d 160 (3d Cir. 2001)........................................................................................7

*In re Oppendahl & Larson LLP*,
    373 F.3d 1171 (Fed. Cir. 2004)................................................................................11

*Jews For Jesus v. Brodsky*,
    993 F. Supp. 282 (D.N.J. 1998) .........................................................................13, 19

iii

*Kos Pharms. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)..................................................................... passim

*Levinson Axelrod, P.A. v. Heyburn*,
  Civ. No. 09-5627 (D.N.J. Jan. 13, 2010) (Docket No. 25) ........................................8

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
  920 F.2d 187 (3d Cir. 1990)..............................................................................18, 20

*Ortho Pharma Corp. v. Amgen, Inc.*,
  882 F.2d 806 (3d Cir. 1989)..........................................................................................7

*Pep Boys Manny, Moe & Jack Of California v. Goodyear Tire & Rubber Co.*,
  2002 WL 524001, No. 01-CV-5614 (E.D. Pa. Apr. 5, 2002) ..................................14

*ProFoot, Inc. v. MSD Consumer Care, Inc.*,
  2012 WL 2262904, Civ. No. 11-7079 (D.N.J. June 14, 2012) ...............................18

*Shields v. Zuccarini*,
  254 F.3d 476 (3d Cir. 2001)........................................................................................15

*Urban Outfitters v. BCGC Max Azria Group, Inc.*,
  511 F. Supp.2d 482 (E.D. Pa. 2007) .........................................................................12

## STATUTES

15 U.S.C. § 1065 .................................................................................................................2

15 U.S.C. § 1072 ...........................................................................................................14, 16

15 U.S.C. § 1114 .................................................................................................................9

15 U.S.C. § 1116(a) .............................................................................................................7

15 U.S.C. § 1125(a) .........................................................................................................9, 15

15 U.S.C. § 1125(d) ...............................................................................................15, 16, 17

Fed. R. Civ. Proc. 65(a) .....................................................................................................7

## OTHER AUTHORITIES

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:50 (4th
  ed. 2003) ...........................................................................................................................7

iv

Plaintiff Newsmax Media, Inc., ("Plaintiff" or "Newsmax") by and through its attorneys, Satterlee Stephens Burke & Burke LLP, respectfully submits this memorandum of law in support of its application for a temporary restraining order and preliminary injunction to prevent irreparable harm arising from defendant Mark Nejmeh's ("Defendant" or "Nejmeh") willfully infringing and bad faith use of the domain and trademark newsmax.us.

## PRELIMINARY STATEMENT

Defendant has registered the domain name newsmax.us in bad faith and now purports to have adopted that domain as the mark for a "political newspaper" and website he is launching. Except for the top level domain ".us," the Defendant's chosen domain is identical to Newsmax's well-known, registered and incontestable marks NEWSMAX and NEWSMAX.COM used for fifteen years in connection with a leading newsmagazine and news website.

Despite being advised of Newsmax's trademark rights, Defendant insists that "NewsMax.us [ . . . ] is totally different than newsmax.com," a position that is, frankly, laughable.  Since NEWSMAX has no other meaning but as a source identifier for Newsmax's goods and services, newsmax.us as used in connection with a political newspaper and website is clearly confusingly similar to NEWSMAX and NEWSMAX.COM.  Defendant was on constructive and likely actual notice of the NEWSMAX and NEWSMAX.COM marks, and there can have been no legitimate purpose for his registration of the newsmax.us domain given the association of these marks exclusively with Plaintiff.

Notwithstanding Defendant's protestations of his good faith because of his "activity with news" and his involvement with journalism, his acts of registering and holding the domain with no legitimate purpose or connection to Plaintiff's Newsmax mark constitute bad faith and cybersquatting. Defendant's bad faith is further evidenced by his demand for $80,000 for the transfer of the domain and his posting of content at the website at newsmax.us only after

1

receiving a demand for transfer of the domain. Moreover, his announced use of newsmax.us as the name of a forthcoming "weekly political newspaper" constitutes flagrant and willful trademark infringement.

Defendant's willful infringement and cybersquatting should not be countenanced and a temporary restraining order and preliminary injunction should issue to protect Plaintiff's valuable intellectual property.

## STATEMENT OF FACTS

The facts relevant to this application are detailed in the Affidavits of Brian Todd and Mark Lerner, both sworn to on October 22, 2013 (respectively, "Todd Aff." and "Lerner Aff."), and the exhibits annexed thereto. Those facts are briefly restated below.

### A.     Newsmax and the Newsmax Marks

Newsmax is one of the United States' preeminent media companies for print and online news, entertainment news and features, and current events. Todd Aff. ¶ 2.

Newsmax began using the mark NEWSMAX.COM in August 1998 in connection with a website featuring current events. *Id.* ¶ 3. Shortly thereafter, in or about January 2000, Newsmax began offering magazines featuring news, entertainment news and features under the mark NEWSMAX. *Id.* Since commencing use of NEWSMAX.COM and NEWSMAX (collectively, the "Newsmax Marks"), Newsmax has continuously and exclusively used those marks and expanded the Newsmax business and brand. *Id.* ¶¶ 4, 10, 20, 22.

Newsmax owns four federal registrations for the Newsmax Marks, two of which are incontestable under 15 U.S.C. § 1065. *Id.* ¶¶ 7, 8, 9; Exs. A-D. Newmax also owns several pending applications for NEWSMAX for use in connection with its new television and radio programming services. *Id.* ¶¶ 10.

2

Since July 1998, Newsmax has continuously owned the domain name newsmax.com for its website, accessible at http://www.newsmax.com, where Newsmax publishes, broadcasts, and promotes its online news and entertainment services. *Id.* ¶ 5.

**B.      Newsmax Marks' Renown and Growing Audience**

In use for nearly fifteen years, the Newsmax Marks have accumulated substantial goodwill of great value due to the high quality of the news, entertainment and information services Newsmax offers under its marks and the wide popularity Newsmax's products and services enjoy among audiences across the United States. *Id.* ¶ 12. These audiences have come to rely on Newsmax for timely, insightful reporting on current news and entertainment and for sharp analysis and commentary. *Id.*

*The New York Times* has called Newsmax an "influential media company that has established itself as a potent force in conservative politics" that "reaches more homes than The Weekly Standard or National Review, two of the higher brow pillars of American conservatism." *Id.*, Ex. F.  Indeed, more visitors go to Newsmax's websites than to such highly trafficked political news websites as Fox News Politics, NBCNews.com Politics, CNN Politics and Politico. *Id.* ¶ 16.  In July 2013 alone, 11.3 million unique visitors went to Newsmax's websites. *Id.* ¶ 15. In a recent week, Newsmax delivered over 90 million email alerts to its 4 million subscribers. *Id.* ¶ 17.

In addition to the print version of its magazine, Newsmax now also publishes editions for a variety of e-reader platforms and for its mobile app for the Apple iPhone and iPad. *Id.* ¶¶ 18-19. Newsmax continues to expand its offerings under the Newsmax Marks and has begun broadcasting online television programming and features streaming video segments on its website at Newsmax.com. *Id.* ¶ 20.

1790200_4

Newsmax grows its audiences by actively promoting its expanding portfolio of media products and services. *Id.* ¶ 22. The Newsmax website's home page is just one such advertising vehicle and is used to drive the website's huge visitorship to Newsmax companion websites, Newsmax online broadcasts, the Newsmax magazine, and the Newsmax e-newsletter. *Id.*

As a result of the longstanding and extensive use of the Newsmax Marks, members of the public recognize the Newsmax Marks used in connection with news as indicating reliable, high quality reporting originating with Newsmax. *Id.* ¶ 23.  In light of the substantial value of the goodwill Newsmax has accumulated in its marks, it carefully polices use of the Newsmax Marks. *Id.* ¶ 13. Newsmax exclusively uses the Newsmax Marks and has never granted any rights to any third party – and specifically never to Defendant – to use those marks or any variation thereof. *Id.*

**C.      Defendant's Bad Faith Registration of Newsmax.us**

Without any legitimate rights to the Newsmax Marks, Defendant registered the domain newsmax.us in January 2011 (the "Domain"). *Id.* ¶ 26, Ex. H. At that time, Newsmax had already been using its Newsmax Marks and its newsmax.com domain for over twelve years.

For nearly the entire time Defendant was the registrant of the Domain, that is, until October 11, 2013, he never used newsmax.us or the newsmax.us website in commerce. *Id.* ¶ 28. Prior to registering the Domain, Defendant offered no legitimate services or business under the name "newsmax" nor could he, given Newsmax's longstanding exclusive ownership and use of the Newsmax Marks. *Id.* ¶ 27.

**D.      Defendant's Refusal to Sell or Transfer Newsmax.us**

Just over one month ago, Newsmax sought to obtain the dormant newsmax.us domain in order to use it in conjunction with its newsmax.com website. *Id.* ¶ 30. Via a third-party service, Newsmax offered Defendant $100 for the Domain. *Id.* In Newsmax's experience, this was an

4

amount that would more than cover the costs of registering the domain and was, additionally, a generous offer given that Defendant had no legitimate rights to register newsmax.us. *Id.*

Even though Defendant was not using the Domain and had registered it in violation of Newsmax's rights, Defendant countered Newsmax's price with a demand for $80,000. *Id.* ¶ 31. Newsmax then raised its purchase offer to $200, which Defendant also rejected, terminating the bidding process at the end of September 2013. *Id.* ¶¶ 32, 33.

Thwarted in its efforts to purchase the Domain by Defendant's greed, Newsmax, on October 11, 2013, through its legal counsel, delivered correspondence to Nejmeh explaining the bases for Newsmax's rights to the Domain and asking that Nejmeh transfer it to Newsmax. *Id.* ¶ 34; Lerner Aff., Ex. A.

Beginning on October 11, 2013, and in response to Newmax's letter, Defendant steadfastly and defiantly refused to transfer the Domain. Todd Aff. ¶ 34; Lerner Aff., Ex. C. In an email dated October 11, 2013, Nejmeh stated "[w]e have no intention of selling [the Domain] and are nor [sic] infringing on a trademark." Lerner Aff., Ex. C. He further advanced that he has "been involved with News [sic] for quite a while." *Id.* Finally, notwithstanding being on actual notice, through correspondence from Newsmax' counsel, of Newsmax's senior and well-established rights as well as its ownership of three federal registrations for the Newsmax Marks that pre-date Defendant's unauthorized registration of the Domain, Defendant also divulged that "[w]e are planning . . . publication of Newsmax.us in The NYC? NJ Market." *Id.*

In response, on October 14, 2013, Newsmax's counsel sent a second letter to Nejmeh demanding that he renounce all plans to launch a Newsmax.us newspaper and transfer the Domain to Newsmax. *Id.*, Ex. B. The letter indicated that Newsmax would be forced to resort to litigation, if Nejmeh did not immediately meet these demands. *Id.*

Nejmeh again refused to acknowledge Newsmax's senior rights to the Domain, responding to Newsmax's counsel that same day with the proclamations "we are not abiding by your demands" and "[w]e are pretty set on the name we own NewsMax.us and this is *totally different than newsmax.com*." *Id.*, Ex. C (emphasis added).

Although Newsmax, though counsel, made further efforts to educate Nejmeh as to why his registration of the Domain and proposed use of the mark newsmax.us constituted bad faith infringement, see *id.*, Nejmeh continued to obstinately disregard Newsmax's senior trademark rights and refused to transfer the Domain or confirm that he would not use newsmax.us for competing goods and services.

**E.    Defendant's Infringing Use of Newsmax.us**

Indeed, on the very same day that Newsmax's counsel first put Nejmeh on notice of Newsmax's superior and exclusive rights to newsmax.us, Nejmeh defiantly commenced infringing use of newsmax.us by posting content for the first time on the website at newsmax.us. *See* Todd Aff. ¶ 36, Ex. I.

On October 11, 2013, Defendant launched a website at the Domain with the headline "NEWSMAX.US coming soon on-line and in your hand" with content claiming that "Newsmax.us is a small company that reports news . . . [that is] ready to launch Newsmax.us." *See id.*, Ex. I.  In additional content posted on October 19, 2013, Defendant announced that a "conservative news journalist" had been hired as editor for "NewsMax.us, our upcoming . . . weekly political newspaper" to be offered online and distributed in print "in Chicago, New York, and Boston." *Id.*

Thus, while rebuffing Newsmax's efforts to avoid litigation, and in apparent direct response to Newsmax's assertion of its superior rights, Nejmeh escalated his infringing and directly competitive use of newsmax.us.

Accordingly, Newsmax submits this emergency application for entry of temporary restraints and preliminary injunctive relief ordering Defendant to cease all use of newsmax.us.

## ARGUMENT

## I.   THE EQUITIES FAVOR ENTRY OF EMERGENCY INJUNCTIVE RELIEF

### A.   Legal Standards

The Lanham Act and Federal Rules of Civil Procedure empower this Court to grant the emergency remedy of a temporary restraining order ("TRO") in order to maintain the status quo until a hearing for a preliminary injunctive relief can be held. *See* 15 U.S.C. § 1116(a); Fed. R. Civ. Proc. 65(a); *Ortho Pharma Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989). The status quo a TRO preserves is the "last, peaceable, noncontested status of the parties." *Kos Pharms. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)). In a trademark case, the noncontested status quo "is the situation *prior* to the time the junior user began use of its contested mark." 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:50 (4th ed. 2003) (emphasis added) *cited in Kos Pharms.*, 369 F.3d at 708.

The standards for granting a TRO are the same as that for a preliminary injunction. *See Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994); *American Civil Liberties Union v. Reno*, 1998 WL 813423, Civ. No. A. 98-5591, at *1 (Nov. 23, 1999).  In the Third Circuit, a plaintiff is entitled to a preliminary injunction upon a demonstration that: (i) it will likely succeed on the merits; (ii) it will suffer irreparable harm if the injunction is denied; (iii) a grant of preliminary relief will not result in greater harm to defendant; and (iv) the public interest favors such relief. *Kos Pharms.*, 369 F.3d at 708. "[O]n an application for preliminary injunction, the plaintiff need only prove a prima facie case, not a certainty that he or she will win." *Highmark Inc. v. UPMC Health Plan*, 276 F.3d 160, 173 (3d Cir. 2001). The Court is to balance the four factors to

7

determine whether equities tip in the plaintiff's favor and warrant the injunctive relief it seeks. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999).

**B.      Newsmax is Entitled to Emergency Injunctive Relief**

As demonstrated in further detail below, all four factors favor granting Newsmax injunctive relief.  First, it is highly likely that Newsmax will succeed on the merits of its claims for trademark infringement, unfair competition, and cybersquatting. Defendant's use of an identical mark for identical services creates a near certainty of consumer confusion. Defendant has also demonstrated bad faith, an element of the cybersquatting claim, because, *inter alia*, he, without any legitimate rights to the mark, registered the domain while on constructive notice of Newsmax's registered mark, then initiated infringing use of the newsmax.us domain only after Newsmax put him on actual notice of Newsmax's exclusive, nationwide rights to NEWSMAX. Defendant is willfully and defiantly infringing the Newsmax Marks; thus, Plaintiff is highly likely to succeed on the merits of its Lanham Act claims.

Second, the likelihood of consumer confusion Defendant is causing through his infringing, bad faith use of newsmax.us constitutes irreparable harm as a matter of law. Third, any harm an injunction might exact on Defendant is not legally cognizable because it is harm that Defendant brought on himself. Finally, the public interest favors avoidance of confusion in the marketplace.

Accordingly, all four factors support entry of a TRO and preliminary injunction. Indeed, this district has recognized that injunctive relief is warranted when, as here, a bad faith actor uses an infringing domain and mark illegitimately and in a manner that is likely to create consumer confusion. *See*, e.g., *Advance Magazine Publishers Inc. v. Vogue Int'l*, 123 F. Supp. 2d 790 (D.N.J. 2000) (granting preliminary injunction based on, *inter alia*, trademark infringement, unfair competition, and cybersquatting); *Levinson Axelrod, P.A. v. Heyburn*, Civ. No. 09-5627

8

(D.N.J. Jan. 13, 2010) (Docket No. 25) (granting preliminary injunction converted from TRO

based on, *inter alia*, trademark infringement, unfair competition, and cybersquatting); *Davinci*

*Tech. Corp. v. Rubino*, 2005 WL 1249462, Civ. No. 05-1561 (D.N.J. May 25, 2005) (granting

preliminary injunction based on, *inter alia*, unfair competition and cybersquatting).

## II.    NEWSMAX IS HIGHLY LIKELY TO SUCCEED ON THE MERITS OF ITS LANHAM ACT CLAIMS

### A.    Standards for Trademark Infringement and Unfair Competition

Identical standards apply for trademark infringement under 15 U.S.C. § 1114 and false

designation of origin and unfair competition under 15 U.S.C. § 1125(a). For both these Lanham

Act claims, a plaintiff must only show that (1) it has a valid and legally protectable mark; (2) it

owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a

likelihood of confusion. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d

Cir. 2000); *Advance Magazine*, 123 F. Supp. 2d 790.

### B.    Newsmax Owns Valid and Protectable Marks

Newsmax satisfies the first two elements of its trademark infringement and unfair

competition claims through its ownership of incontestable U.S. registrations for

NEWSMAX.COM (Reg. No. 2721043) and NEWSMAX (Reg. No. 3177090). *Fisons*

*Horticulture v. Vigoro Indus.*, 30 F.3d 466, 472 (3d Cir. 1994).  Moreover, because "newsmax"

is a coined term with no meaning other than as a designation for Newsmax's goods and services,

all four Newsmax Marks are inherently distinctive and therefore valid and legally protectable.

*See id.*; *Advance Magazine*, 123 F. Supp.2d at 795, 795 n.8.

### C.    Defendant's Domain and Mark Are Likely to Cause Consumer Confusion

Newsmax can also easily establish the remaining element of likelihood of confusion

because Defendant's mark is effectively identical to Newsmax's incontestable marks, and

9

newsmax.us is being used in connection with an online and print newspaper. Moreover, the facts

of this case demonstrate that Defendant's infringement of the Newsmax Marks is willful.

To determine whether consumer confusion is likely, the Third Circuit evaluates ten

factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
>
> (2) the strength of the owner's mark;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
>
> (5) the intent of the defendant in adopting the mark;
>
> (6) the evidence of actual confusion;
>
> (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
>
> (8) the extent to which the targets of the parties' sales efforts are the same;
>
> (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; and
>
> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*A & H Sportswear*, 237 F.3d at 212-13 (citing what are known as the *Lapp* factors). A

court is to make all relevant comparisons the *Lapp* factors suggest, giving most weight to

the factors that are most applicable to the given facts. *See Kos Pharms.*, 369 F.3d at 709,

711. While no factor alone is determinative, the degree of the marks' similarity is the

"single most important factor." *Id.* at 709, 712.

> i. *The Newsmax Marks and Newsmax.us are Effectively Identical (Factor 1)*

10

Newsmax.us is essentially identical to the Newsmax Marks (NEWSMAX and NEWSMAX.COM). The marks are likely to have the same overall impression on consumers because they look the same, sound the same, and have the same coined meaning derived from the combination of the terms "news" and "max." *See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 281 (3d Cir. 2001) (explaining method for determining marks' similarity). The marks are identical but for the addition of the top-level domains ".us" and ".com," which have no trademark significance and no part in the likelihood of confusion analysis. *See In re Oppendahl & Larson LLP*, 373 F.3d 1171, 1173 (Fed. Cir. 2004); *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp.2d 380, 428 (D.N.J. 2011) ("Courts generally ignore extensions like ".com" or ".org" when evaluating whether domain names are identical.").

Because newsmax.us is effectively identical to the Newsmax Marks, this factor weighs heavily in favor of a finding of likelihood of confusion. *See Davinci Tech.*, 2005 WL 1249462, at *4 ("if the overall impression created by the marks is essentially the same, it is very probable that the marks are confusingly similar") (internal quotations and citation omitted). Moreover, when, as here, the goods and services are directly competing and the marks are clearly very similar, "a district judge should feel free to consider only the similarity of the marks themselves." *A & H Sportswear*, 237 F.3d at 213. This "single most important factor" thus weighs very heavily in Newsmax's favor. *See Kos Pharms.*, 369 F.3d at 712.

### ii.   The Newsmax Marks are Distinctive and Strong (Factor 2)

A mark's strength is generally measured by its distinctiveness and the strength of its commercial recognition. *See A&H Sportswear*, 237 F.3d at 221. As set forth above, the Newsmax Marks are inherently distinctive. NEWSMAX is a coined term created solely to identify Plaintiff's goods and services. In addition, the Newsmax Marks are commercially strong because Plaintiff has used the Newsmax Marks extensively in the marketplace for the past fifteen

years. *See* Todd Aff ¶¶ 15-22. Plaintiff's goods and services have additionally been quite successful and have been recognized by unsolicited media stories, also good indications of the strength of the mark. See *id.*; *Advance Magazine*, 123 F. Supp.2d at 797 (commercial strength shown through extent and duration of use of a mark ); *Urban Outfitters v. BCGC Max Azria Group, Inc.*, 511 F. Supp.2d 482, 493 (E.D. Pa. 2007) (commercial strength established by evidence of success of goods offered under the mark, including extent of sales figures, unsolicited media stories, and overall management of brand).

"'Under the Lanham Act, stronger marks receive greater protection' because they 'carry greater recognition, [so that] a similar mark is likely to cause confusion.'" *Kos Pharms.*, 396 F.3d at 715 (citing *A&H Sportswear*, 237 F.3d at 222). Since Defendant's mark is identical to Plaintiff's distinctive and commercially strong marks, this factor also weighs solidly in favor of Newsmax.

> iii. *Defendant is Promoting Identical Goods and Services through the Same Channels of Trade and to the Same Consumers (Factors 7, 8 and 9)*

A strong likelihood of confusion exists when the parties' goods and services are closely related and fall within the same industry or class. *Kos Pharms.*, 396 F.3d at 723; *Advance Magazine*, 123 F. Supp.2d at 797. Here, Defendant is promoting the identical goods and services Newsmax offers to the public. Since 2000, Newsmax has published, online and in print, political news and commentary with a strong conservative editorial voice. Just over one week ago, Defendant began using the Domain to promote "Newsmax.us" as a "political newspaper . . . and website" whose recently-hired editor is "a conservative news journalist." *See* Todd Aff., Ex. I. Newsmax naturally uses its own website both to deliver and to promote its media products and services. *Id.* ¶ 22, Ex. G.

Defendant is thus promoting goods and services that that are identical to and directly competitive with the goods and services that Newsmax has long offered and promoted. Additionally, Defendant is promoting the identical news-related goods and services via the internet, which is the same channel of trade that Newsmax has long used to both deliver and promote its goods and services. Finally, Defendant is targeting the same audiences for online and print political news that Newsmax has long claimed. The *Lapp* factors concerning the relationship between the goods, the channels in which they are promoted, and their target consumers, therefore, all strongly favor Newsmax.

 *iv. The Parties' Consumers are Likely to be Confused (Factor 3)*

The Court may also weigh the care and attention expected of the parties' consumers to determine if confusion is likely. Here, Newsmax and Defendant concurrently use the mark newsmax as the domain and mark for websites. This District has noted that vast internet use is an indication that many internet consumers are "not particularly sophisticated." *Advance Magazine*, 123 F. Supp.2d at 797. Given online users' lack of sophistication and the speed and ease of internet use, consumers are likely to be confused as to the ownership of Defendant's website because its Domain is essentially same as Newsmax's domain and the Newsmax Marks. *See Jews For Jesus v. Brodsky*, 993 F. Supp. 282, 303 (D.N.J. 1998); *Dluhos v. Strasberg*, 2005 WL 1683696, Civ. No. 00-3163, at *7 (D.N.J. June 24, 2005). This factor, therefore, also favors Newsmax.

 *v. Defendant is Willfully Infringing the Newsmax Marks*
  *(Factor 5)*

"[E]vidence of intentional, willful and admitted adoption of a mark closely similar to the existing mark[ ] weighs strongly in favor of finding [a] likelihood of confusion." *Kos Pharms.*, 369 F.3d at 721 (quotation marks and citation omitted). Here, Newsmax's federal registration of

the Newsmax Marks provided Defendant with constructive notice that NEWSMAX was unavailable. *See* 15 U.S.C. § 1072. Had Defendant investigated prior to registering the Domain and adopting the mark, he would certainly have found Plaintiff's prior and well-established use of the Newsmax Marks. A defendant's failure to adequately investigate and evaluate its rights to a proposed mark is highly relevant to a finding that confusion is likely. *See Kos Pharms.,* 369 F.3d at 721.

Additionally, Defendant was on *actual* notice that Newsmax had exclusive, nationwide rights to the Newsmax Marks when he initiated actual competitive use of newsmax.us in commerce. Defendant received and responded to Newsmax's cease and desist letter asserting and demonstrating Newsmax's rights, on the same day he first posted content to the newsmax.us website announcing that "we are ready now and we are ready to launch Newsmax.us" to "report news." *See* Todd Aff. ¶ 36, Ex. I. Indeed, it can only be assumed that Defendant began use of newsmax.us in direct response to Newsmax's assertion of its longstanding rights to the Newsmax Marks. Defendant's intentional, vindictive, and defiant use of newsmax.us weighs strongly in favor of Newsmax.

### vi.  Actual Confusion is Not Relevant (Factors 4 and 6)

The fourth and fifth *Lapp* factors are not entitled to much weight here because Defendant first began using newsmax.us just over one week before Newsmax filed the instant application. *See* Todd Aff. ¶ 37, Ex. I; *see also Pep Boys Manny, Moe & Jack Of California v. Goodyear Tire & Rubber Co.*, 2002 WL 524001, No. 01-CV-5614, at *7 (E.D. Pa. Apr. 5, 2002) (finding concurrent use of marks on goods for less than four months too short for lack of actual confusion to be probative in the confusion analysis). Indeed, Plaintiff seeks injunctive relief precisely to prevent actual confusion from occurring.

14

In sum, because all the foregoing relevant *Lapp* factors weigh in favor of Newsmax, Defendant's Domain and mark are likely to cause consumer confusion with Newsmax's valid and protectable Marks and there is thus a substantial likelihood that Newsmax will succeed on the merits of its trademark infringement and unfair competition claims.

## III.   NEWSMAX IS LIKELY TO SUCCEED ON THE MERITS OF ITS CYBERSQUATTING CLAIM UNDER 15 U.S.C. § 1125(D)

### A.   Standards for Anti-Cybersquatting Consumer Protection Act

To establish a claim under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), a plaintiff must prove three elements: (1) that its mark is distinctive or famous; (2) that the disputed domain name is identical or confusingly similar to plaintiff's mark; and (3) defendant chose the domain name with the bad faith intent to profit from its use. *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir. 2001).

Newsmax has already established above the first two elements. *See Davinci Tech.*, 2005 WL 1249462, at *7 (finding establishment that plaintiff's mark is distinctive and defendant's mark is identical or confusingly similar under 15 U.S.C. § 1125(a) satisfies the first two prongs for cybersquatting under 15 U.S.C. § 1125(d)).

To determine whether a defendant has a bad faith intent to profit from the domain name, the ACPA lists nine non-exclusive factors that a court may consider. 15 U.S.C. § 1125(d). Courts are not limited to consideration of factors the statute provides, but may consider any other indications of bad faith. *Advance Magazine*, 123 F. Supp.2d at 800.  Five of these factors, relevant to this action, are as follows:

> (I)    the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II)   the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)  the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

[ . . . ]

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

15 U.S.C. § 1125(d)(B)(i).

**B.      Defendant's Registration and Use of the Domain Evidences Bad Faith**

A consideration of the relevant factors under the ACPA evidences that Defendant registered and is using the Domain with a bad faith intent to profit from the Domain.

   *i.   Defendant Has No Legitimate Rights to the Domain
          (Factors I and II)*

There is no evidence that Defendant owned a federal registration or pending application for the Domain as a trademark prior to registering it in January 2011. Todd Aff. ¶¶ 24, 27. Nor, indeed, is there any indication of common law use by Defendant prior to its registering the Domain. *Id.* In contrast, well before Defendant registered the Domain, Newsmax owned federal registrations for the Newsmax Marks and had been using them for over twelve years. *See* Todd Aff.  ¶¶ 7, 8, 26. As set forth above, the Newsmax Marks' federal registrations constitute constructive notice of Newsmax's exclusive rights to the Newsmax Marks and thus to the newsmax.us domain. *See* 15 U.S.C. § 1072.

Moreover, if Defendant's assertion that he has been "involved in News for quite a while" is credited, see Lerner Aff., Ex. C, it is unlikely that Defendant could claim that he was unaware of the Newsmax Marks given the duration and extent of their use in the news industry. *See Advance Magazine*, 123 F. Supp.2d at 801 (noting that defendant's work in the same industry in

16

which plaintiff has used its mark is indicative of bad faith under 15 U.S.C. § 1125(d)). Newsmax

is furthermore not aware of any other entity, including Defendant, that is known in the trade or

community at large by the name Newsmax. Todd Aff. ¶ 24. And Newsmax never granted any

rights to Nejmeh to use the Newsmax Marks or any variation thereof. *Id.* ¶ 25.

>    ii. *Defendant Makes No Bona Fide or Fair Use of the Domain
>        (Factors III and IV)*

Defendant did not begin using the Domain in commerce until the same day that

Newsmax's counsel advised Defendant of Newsmax's exclusive rights to the Domain and

demanded its transfer to Newsmax. Todd Aff. ¶ 36. As set forth above, Defendant has recently

used the website at the Domain to announce the launch of goods and services that are directly

competitive with Newsmax's established goods and services. Defendant's use of the website at

the Domain is therefore not bona fide.

>    iii. *Defendant Sought to Sell the Domain for a Significant Sum
>         (Factor VI)*

Defendant responded to Newsmax's offer to purchase the Domain for $100 by

demanding payment of $80,000. *Id.* ¶ 31. Even when Newsmax decided to double its initial

offer, Defendant rejected the amount, which ended the bidding process. *Id.* ¶¶ 32 and 33.

Registering an infringing domain, as Defendant did, and demanding an exorbitant price for its

transfer to the rightful owner is "a quintessential act of cybersquatting." *Green v. Fornario*, 486

F.3d 100, 105 (3d Cir. 2007) (*dicta*).

In sum, despite a lack of any rights or legitimate use of the Domain, Defendant attempted

to sell it to Plaintiff at a huge profit. When the sale of the unused Domain for an inflated sum

failed and Newsmax as the rightful owner demanded transfer of the Domain, Defendant then

began using the Domain to promote the same services Newsmax has long offered under its

identical marks. Based on these facts, Defendant's conduct evidences a bad faith intent to profit

from the Newsmax Marks' superior reputation and valuable goodwill. Accordingly, Newsmax is highly likely to succeed in proving the merits of its cybersquatting claim.

## IV.   NEWSMAX WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED

The Third Circuit has consistently held that "trademark infringement amounts to irreparable injury as a matter of law." *Kos Pharms.*, 369 F.3d at 726 (citing *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 378 (3d Cir.1992)); *see also ProFoot, Inc. v. MSD Consumer Care, Inc.*, 2012 WL 2262904, Civ. No. 11-7079, at **13, 13 n.3 (D.N.J. June 14, 2012). "[O]nce the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury." *Kos Pharms.*, 369 F.3d at 726 (citing *Pappan Enters., Inc.v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir.1998)); *see also  Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196-97 (3d Cir. 1990). The presumption that likelihood of confusion constitutes irreparable harm applies equally to a finding under the ACPA that a domain name is identical or confusingly similar to a distinctive mark. *See Advance Magazine*, 123 F. Supp.2d at 801 n.16.  Therefore, having established likelihood of success on the merits of all its Lanham Act claims, Newsmax "is entitled to a presumption that it will suffer irreparable harm absent an injunction." *Kos Pharms.*, 369 F.3d at 726.

Here, the facts additionally demonstrate the urgency for the restraints Newsmax seeks. Defendant's sudden and rapid efforts to use the Domain and newsmax.us to intentionally and directly injure Newsmax warrant emergency relief. On October 11, 2013, Defendant added content to  the newsmax.us website for the first time to announce that Newsmax.us was "ready to launch" as a news reporting website. *See* Todd Aff., Ex. I. Just eight days later, and one day after Newsmax filed its complaint in this action, Defendant added new content to the newsmax.us

18

website further announcing that "NewsMax.us" will be a print and online political newspaper, that an editor for the NewsMax.us had been hired, and that the newspaper will be distributed in Chicago, New York, and Boston. *See id.* Indeed, the timing of Defendant's infringement and its escalation betray Defendant's intent to retaliate against Newsmax in response to Newsmax's good faith efforts to obtain the Domain without resort to litigation. Todd Aff. ¶ 41. Newsmax thus can only believe that Defendant will continue to harm Newsmax and the immeasurable value of its Newsmax Marks unless and until this Court enjoins Defendant from all infringing use of newsmax.us.

Newsmax will thus suffer irreparable injury to its reputation and to the goodwill of its Newsmax Marks as a matter of law. The equities additionally favor protecting Newsmax when Defendant has intentionally initiated infringement to injure Newsmax.

## V.   DEFENDANT WILL NOT SUFFER ANY LEGALLY COGNIZABLE HARM IF INJUNCTIVE RELIEF IS GRANTED

As stated above, Defendant was on both constructive and actual notice of Newsmax's exclusive rights to the Domain by virtue of the Newsmax Marks. Defendant began using the Domain as a mark only after and on the same day that Newsmax asserted its rights. *Id.* ¶ 36.

Under these circumstances, Defendant will have brought on himself any harm he might claim will occur if this Court enjoins him from using newsmax.us. *See Jews For Jesus*, 993 F. Supp. at 312 (a defendant cannot complain he will suffer irreparable injury if an injunction is issued because he misappropriated a plaintiff's trademark with full knowledge of the plaintiff's rights). Such self-inflicted harm is not legally recognized. *See Kos Pharms.*, 396 F.3d at 728. Indeed "a different rule would allow a knowing infringer" to construct "its business around its infringement to avoid an injunction by claiming it would have a devastating effect on that business." *Id.* at 728-29 (internal quotation marks and citation omitted). This is particularly true

here, where the facts indicate that Defendant is willfully infringing the Newsmax Marks in retaliation against Newsmax's efforts to protect its intellectual property.

On balance, emergency injunctive relief that preserves the status quo of non-infringement will not and, as a matter of law, cannot cause Defendant any cognizable harm.

## VI.    THE PUBLIC INTEREST FAVORS AN INJUNCTION

In a trademark case, the public interest is "most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n*, 920 F.2d at 197. As demonstrated above, Defendant's deliberate use of newsmax.us to promote the launch of a political newspaper is likely to confuse the public as to the source of the website and any other products and services offered under newsmax.us. This infringing use damages the public interest. *See id.* at 198 (where damage to the public is established by a likelihood of confusion, "a prohibition upon [defendant's] use of [its] mark[] would eliminate that confusion"). Consequently, the harm to the public if Defendant were not enjoined from using newsmax.us favors the grant of a temporary restraining order and preliminary injunction.

## CONCLUSION

Based on the foregoing, and on a balance of the equities, Newsmax is entitled to
temporary restraints and a preliminary injunction to maintain the status quo of non-infringement
of the Newsmax Marks. Accordingly, this Court should grant Newsmax's application and enter
the requested relief.

Dated:  October 23, 2013                              Respectfully submitted,

                                                     **SATTERLEE STEPHENS BURKE &
                                                     BURKE LLP**


                                             By:    _s/ James I. Doty_
                                                    James I. Doty
                                                    230 Park Avenue
                                                    Suite 1130
                                                    New York, NY 10169
                                                    Tel: (212) 818-9200
                                                    jdoty@ssbb.com

                                                    *Attorneys for Plaintiff Newsmax Media, Inc.*



*Of Counsel*:

SATTERLEE STEPHENS BURKE & BURKE LLP
Mark Lerner
M.J. Williams
230 Park Avenue
Suite 1130
New York, NY 10169
Tel: (212) 818-9200
mlerner@ssbb.com
mwilliams@ssbb.com